## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JAMES LEE TYNER,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:09cv00015 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

The plaintiff, James Lee Tyner, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Tyner protectively filed his applications for DIB and SSI on August 9, 2005, (Record, ("R."), at 76), alleging disability as of July 15, 2005, (R. at 52-56, 261-64), due to problems with his eyesight, knees, back, nerves/anxiety and diabetes. (R. at 79, 101.) The claims were denied initially and upon reconsideration. (R. at 28-29, 265-66.) Tyner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 41.) A hearing was held on July 20, 2007, at which Tyner testified and was represented by counsel. (R. at 286-315.)

By decision dated August 31, 2007, the ALJ denied Tyner's claims. (R. at 16-22.) The ALJ found that Tyner met the insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 21.) The ALJ also found that Tyner had not engaged in substantial gainful activity since July 15, 2005, the alleged onset date of disability. (R. at 21.) The ALJ determined that the medical evidence established that Tyner suffered from severe impairments, namely diabetes mellitus with diabetic neuropathy and peripheral neuropathy, obesity, borderline intellectual functioning and anxiety disorder. (R. at 21.) However, he found that Tyner did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ

noted that Tyner's allegations regarding his limitations were not totally credible. (R. at 21.) The ALJ determined that Tyner retained the residual functional capacity to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and sit, stand or walk for a total of six hours in a typical eight-hour workday. (R. at 21.) The ALJ also found that Tyner could not perform jobs that would require more than occasional pushing or pulling with the lower extremities, or that would involve more than occasional climbing, balancing, kneeling, crouching, crawling, bending or stooping, and that he would be precluded from climbing ladders, ropes or scaffolds, as well as working in environments with concentrated exposure to hazards. (R. at 21.) The ALJ further found that Tyner could not perform jobs that required excellent vision and good depth perception, and he also could not perform jobs unless they were simple, easy to learn and required no more than minimal reading. (R. at 21.) Based upon these findings, the ALJ found that Tyner was unable to perform his past relevant work. (R. at 22.) In addition, it was noted that Tyner had not acquired any skills from his past relevant work that would be transferable to other jobs within his residual functional capacity. (R. at 22.) The ALJ found that, although Tyner's limitations did not allow him to perform the full range of light work,[1] there were a significant number of jobs in the national economy that Tyner could perform, such as a cleaner, a general production worker and a packer. (R. at 22.) Thus, the ALJ concluded that Tyner was not under a disability as defined in the Act and was not entitled to benefits. (R. at 30-31.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

After the ALJ issued his decision, Tyner pursued his administrative appeals and sought review of the ALJ's decision, (R. at 11-12), however, the Appeals Council denied his request for review. (R. at 5-10.) Tyner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Tyner's motion for summary judgment, which was filed September 4, 2009, and on the Commissioner's motion for summary judgment, which was filed September 22, 2009.

## *II. Facts*

Tyner was born in 1957, (R. at 52, 261), which classifies him as a "younger person" under §§ 404.1563(c), 416.963(c). According to the record, Tyner has a high school education, (R. at 83), and past relevant work experience as a driver for truck and van companies. (R. at 85.)

At the hearing before the ALJ on July 20, 2007, Tyner testified that he was in special education classes from the seventh grade through the twelfth grade because he was unable to keep up with the required work. (R. at 293-94.) However, the ALJ noted that Tyner had previously indicated on a disability form that he did not attend special education classes. (R. at 293.) Tyner explained that he must have omitted that information, and his counsel indicated that his diploma showed that he received an "exceptional child education." (R. at 294.) He further testified that he had a learning disability, noting that he had difficulty reading. (R. at 294.)

Tyner testified that he worked as a truck driver in the past, and he stated that he still had his Commercial Driver's License, ("CDL"). (R. at 295.) He explained that, when he renewed his CDL, he had to have the test read to him because of his problems with reading. (R. at 295.) He also explained that he drove his car occasionally, but noted that he no longer drove trucks. (R. at 296.) Tyner testified that he limited his driving in a car due to poor eyesight. (R. at 296.) He acknowledged that he had been diagnosed with diabetic retinopathy, stating that he experienced bleeding behind his eyes and collapsed blood vessels. (R. at 296.) Tyner stated that the condition caused vision problems, such as blurred vision. (R. at 296.) He testified that he continued to have good vision out of his right eye, but stated that the vision out of his left eye was all a blur. (R. at 296-97.)

Tyner also indicated that he suffered from diabetic neuropathy, which caused numbness in his feet. (R. at 297.) He commented that after walking approximately 20 minutes, pain radiated into his legs, forcing him to sit down. (R. at 297.) Tyner stated that he experienced constant numbness in both feet, but that he did not use any assistive devices for ambulation. (R. at 297.) Tyner testified that he was diagnosed with diabetic neuropathy approximately three years prior to the hearing. (R. at 298.)

When asked about his past work, Tyner testified that he worked as a van driver and truck driver, stating that he quit working due to his problems and then attempted to "try it again [but] just couldn't do it." (R. at 298.) He further testified that he quit work due to his nerves, as well as his vision problems. (R. at 298-99.) Tyner later testified that his work as a tractor-trailer driver required him to tarp the truck, noting

that the tarp weighed approximately 60 pounds. (R. at 308.) Tyner claimed that he had a short attention span, and he also stated that he did not enjoy social interaction. (R. at 299.) Tyner described his daily activities, stating that he typically he got up, ate breakfast, tried to do his dishes, lied on the couch, then tried to get up and walk around and then would lie back down. (R. at 300.)

Tyner testified that he had also been diagnosed with depression and anxiety, but said that he was unable to afford treatment. (R. at 300.) He stated that he did not have insurance, pointing out that his wife paid for the treatment he had received. (R. at 300.) Tyner said that he was taking medication to treat the conditions, suggesting that the medication helped "[a] little bit." (R. at 301.) He then noted that he suffered from arthritis in his left knee and lower back. (R. at 301.) Tyner was then asked if he could afford his medication, particularly his diabetes medication, to which he responded, "we're doing it, but sometimes I do without." (R. at 301.)

Tyner explained that his wife drove him to the hearing, reporting that he only drove short distances, such as four to five miles. (R. at 301-02.) He testified that he did not perform work outside of his house, noting that he did try to push mow his yard, but that after about 15 minutes he was forced to sit down due to leg pain. (R. at 303.) Tyner claimed that his wife performed all of the household chores, (R. at 304-05), and he again noted that he tried to do dishes, but that he was unable to stand for extended periods. (R. at 304.) Tyner testified that he experienced a lack of energy and difficulty sleeping when lying down. (R. at 305.) He indicated that he had not followed the instructions of his doctors regarding exercise and weight loss. (R. at 306.)

Robert Jackson, a vocational expert, also was present and testified at the hearing. (R. at 306-13.) Jackson identified Tyner's past work as a van driver as sedentary[2] and unskilled and his work as a tractor-trailer driver, as he described it in his testimony, as heavy[3] and semi-skilled. (R. at 309.) Jackson explained that such an occupation was typically classified as medium[4] and semi-skilled. (R. at 309.) The ALJ asked Jackson to consider a hypothetical individual of the same age, education and past work experience of Tyner, who could only occasionally lift and/or carry, including upward pulling, items weighing up to 20 pounds, frequently lift and/or carry, including pulling, items weighing up to 10 pounds. (R. at 310.) The individual would be able to stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 310.) Furthermore, such an individual would be limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling, and the individual would have to avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights. (R. at 310.) Jackson testified that there was nothing within the above-mentioned limitations that would preclude Tyner from performing his past work as a van driver. (R. at 310.)

---

[2]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

In adding to the first hypothetical, the ALJ asked Jackson to consider that, due to mental limitations, the hypothetical individual would be limited to simple, easy to learn, unskilled jobs. (R. at 310.) Jackson explained that the additional mental limitations would not change his opinion that the individual would be able to perform his past work as a van driver. (R. at 310.) Jackson further opined that an individual with a reading disability would be able to perform the job as a van driver, explaining that the individual would only need the ability to read addresses and street signs. (R. at 311.)

Next, the ALJ asked Jackson to consider a hypothetical individual of the same age, education and past work experience as Tyner, who could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 311.) The ALJ further noted that such an individual would be able to occasionally push and pull in both lower extremities, such as needed in the operation of foot controls. (R. at 311.) Additionally, the ALJ stated that the hypothetical individual could occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds, occasionally balance, kneel, crouch, crawl, stoop and bend, and would have a visual impairment that would limit him in work that required excellent eyesight, such as working with very small, detailed objects that required good depth perception. (R. at 311-12.) The ALJ also indicated that the individual should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights, and he stated that, due to mental impairments, the individual would be limited to simple, easy to learn, unskilled work that would not require a

great deal of reading. (R. at 312.) Jackson testified that such an individual would be unable to perform Tyner's past employment as a van driver. (R. at 312.) However, Jackson explained that other light, unskilled jobs would be available, such as a cleaner, a general production worker and a packer. (R. at 312.)

The ALJ then asked Jackson to consider a hypothetical individual of the same age, education and past work experience as Tyner, who had a fair, i.e., unsatisfactory job performance, ability to follow work rules, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, function independently and maintain attention and concentration. (R. at 312-13.) Jackson opined that someone with such limitations would be precluded from all employment. (R. at 313.) The ALJ noted that Tyner had testified that he could perform some activities around the house for short periods and, after doing so, was forced to lie on the couch and would then watch television. (R. at 313.) The ALJ asked Jackson how much time was allowed for breaks in a typical eight-hour workday for the identified jobs of a cleaner, a general production worker and a packer. (R. at 313.) Jackson stated that such jobs would allow for 15-minute breaks in the morning and evening, as well as a 30-minute lunch and a few bathroom breaks throughout the day. (R. at 313.) Jackson further testified that someone who needed to take a number of unscheduled breaks to lie down or to be in a reclining position would be unable to maintain competitive employment. (R. at 313.)

In rendering his decision, the ALJ reviewed medical evidence from Hillsborough County Public Schools; Dr. Karl Konrad, Ph.D., M.D.; Donna Abbott, M.A.; Howard Leizer, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D.,

a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Khalid Awan, M.D.; Gary C. Hubbard, O.D.; Stone Mountain Health Services; Southwestern Retina Associates; Joe Owens, D.P.M.; Family Practice Duffield; B. Wayne Lanthorn, Ph.D.; and Holston Medical Group.  Tyner's counsel also submitted medical records from Dr. Fred A. Merkel, D.O., and B. Wayne Lanthorn, Ph.D., to the Appeals Council.[5]

Dr. Karl Konrad, Ph.D., M.D., performed a consultative examination on November 21, 2005.  (R. at 142-44.)  Tyner reported back pain, diabetes, left knee pain and problems with his nerves.  (R. at 142.)  He also reported bilateral foot numbness and a past surgery to address retinal bleeding.  (R. at 142.)  Tyner claimed that his knee pain was exacerbated if he walked more than one-fourth of a mile, or if he had to drive a truck that required use of a clutch.  (R. at 142.)  With regard to his nerve problems, Tyner indicated that he was irritable and easily upset.  (R. at 142.)  Dr. Konrad noted that there was no history of psychiatric hospitalization and that Tyner was not involved in counseling at the time of the evaluation.  (R. at 142.)  Dr. Konrad further noted that Tyner had a limited range of motion of the right shoulder, but all other joints had full range of motion with no tenderness, heat, swelling or deformity.  (R. at 143.)  Tyner's neck was supple with a full range of motion, and Dr. Konrad reported that a back examination showed no kyphosis, scoliosis, scars, tenderness or muscle spasms.  (R. at 143.)  Tyner exhibited a normal lumbar flexure and straight leg raises were negative in the sitting and supine positions.  (R. at 143.)

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings.  *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Dr. Konrad observed that Tyner could hear fairly loud conversational speech at six feet. (R. at 143.) Tyner also exhibited 5/5 strength in the upper and lower extremities, and the remaining physical examination was unremarkable. (R. at 143.) A mental status examination indicated that Tyner was alert and oriented, his thought and ideas were normal, his behavior was appropriate, his memory was normal, as was his affect and ability to groom himself. (R. at 144.) Furthermore, Tyner was found to be of average intelligence and able to handle his own funds. (R. at 144.)

Dr. Konrad's summary of the physical examination indicated that Tyner had apparent decreased left visual acuity and limited range of motion in the right shoulder and lumbar spine. (R. at 144.) Tyner also displayed diminished response to pin prick, vibration and light touch in both feet. (R. at 144.) An x-ray of the left knee yielded normal results and an x-ray of the lumbar spine showed small anterior osteophytes at L4 and L5. (R. at 144.) Dr. Konrad found that Tyner could occasionally lift and/or carry, including upward pulling, for up to one-third of a typical eight-hour workday a maximum of 50 pounds, frequently lift and/or carry from one-third to two-thirds of a typical eight-hour workday a maximum of 25 pounds, stand and/or walk with normal breaks for a total of six hours in a typical eight-hour workday and sit with normal breaks for a total of six hours in a typical eight-hour workday. (R. at 144.) Dr. Konrad diagnosed Tyner with diabetes, decreased left visual acuity, elevated blood pressure, limited range of motion of the lumbar spine with minimal degenerative changes and limited range of motion of the right shoulder. (R. at 144.)

A consultative psychological evaluation was performed by Donna Abbott,

M.A., and B. Wayne Lanthorn, Ph.D. (R. at 147-54.) Tyner's presenting problems were noted as back and knee pain, nerves and diabetes. (R. at 147.) Tyner also reported that he did not like crowds, traffic or going to stores, and explained that he experienced pain in his right shoulder and in his left leg, as well as numbness in his feet. (R. at 148.) He indicated that he could not sit or stand for extended periods. (R. at 148.) Lanthorn and Abbott administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), in which Tyner obtained a verbal IQ score of 73, a performance IQ score of 78 and a full scale IQ score of 74. (R. at 150.) He also obtained a verbal comprehension index score of 67 and a perceptual organization index score of 80, with the scores showing a significant discrepancy and obviously favoring the perceptual organization abilities. (R. at 151.) Tyner was diagnosed with moderate generalized anxiety disorder, borderline intellectual functioning, self-report of chronic left knee, lower back and right shoulder pain, diabetes mellitus, cataracts in one eye, high blood pressure and stomach problems. (R. at 152.) In addition, it was noted that Tyner suffered from ongoing health problems, unemployment, limited educational and intellectual ability and a then-current Global Assessment of Functioning, ("GAF"), score of 50.[6] (R. at 152.)

Lanthorn and Abbott further found that Tyner could understand and remember on a level commensurate with his intellectual functioning and that he would experience difficulty with detailed or complex instructions. (R. at 152.) Lanthorn and

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning[.]" DSM-IV at 32.

Abbott also found that Tyner's borderline intellectual functioning fell within the lower limits and his performance abilities were better developed than his verbal abilities. (R. at 152.) It was determined that he could attend and concentrate for short periods of time, and he was likely to have problems maintaining attention and concentration due to anxiety and physical complaints. (R. at 152.) Tyner was found to have difficulties sustaining a routine and his social interaction was found to be moderately limited due to generalized anxiety, not liking to be around people and his over-sensitiveness to noise. (R. at 152.) Abbott and Lanthorn also found Tyner to be moderately limited in his general adaptation skills, which was related to his generalized anxiety, limited educational and intellectual skills and physical complaints. (R. at 152.) The evaluation showed that Tyner would also have difficulty driving alone in unfamiliar places, but that he was able to be aware of normal hazards and take precautions. (R. at 152.) It was noted that he would have some difficulties working in proximity to others and in adapting to change and dealing with stress. (R. at 152.) Lanthorn and Abbott noted that Tyner appeared to put forth good effort during the evaluation and presented himself in a genuine fashion. (R. at 152.) It was noted that he might benefit from treatment with a psychiatrist for appropriate use of medications to address his psychological problems. (R. at 152.) Tyner's prognosis was found to be guarded. (R. at 152.)

On December 12, 2005, Dr. Donald R. Williams, a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 176-82.) Dr. Williams found that Tyner could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in a typical eight-hour workday

and that Tyner had an unlimited ability to push and/or pull. (R. at 177.) Dr. Williams also found that Tyner was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 178.) No manipulative, visual or communicative limitations were noted. (R. at 178-79.) As for environmental limitations, Dr. Williams determined that Tyner should avoid concentrated exposure to hazards such as machinery and heights. (R. at 179.) Dr. Williams indicated that the treating or examining source statements regarding Tyner's physical capacities were not in the file that he reviewed. (R. at 180.) Dr. Williams noted that Tyner's allegations were found to be partially credible. (R. at 182.) These findings were reviewed and affirmed by Dr. Frank M. Johnson, M.D., a state agency physician, on May 1, 2006. (R. at 180.)

Howard Leizer, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on January 12, 2006. (R. at 172-75.) Leizer found that Tyner was not significantly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand, remember and carry out very short and simple instructions; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 172-73.) Leizer found Tyner to be moderately limited in the following areas: the ability to understand, remember and

carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (R. at 172-73.) These findings were reviewed and affirmed by Eugenie Hamilton, Ph.D., on May 1, 2006. (R. at 174.)

Leizer later completed a Psychiatric Review Technique form, ("PRTF"), on January 17, 2006, in which he noted that a residual functional capacity assessment was necessary, and he indicated that Tyner had symptoms of mental retardation and anxiety-related disorders. (R. at 158-71.) However, Leizer determined the medically determinable impairments of borderline intellectual functioning and anxiety disorder did not precisely satisfy the required diagnostic criteria. (R. at 162-63.) Leizer found that Tyner would be mildly limited in his activities of daily living and in his ability to maintain social functioning, and he noted that Tyner was moderately limited in his ability to maintain concentration, persistence or pace. (R. at 168.) There was no evidence of episodes of decompensation. (R. at 168.) Leizer found Tyner's allegations to be partially credible, and he concluded that Tyner appeared to be capable of competitive, unskilled substantial gainful activity. (R. at 171.) Leizer's findings were reviewed and affirmed by Hamilton on May 1, 2006. (R. at 158.)

Dr. Khalid J. Awan, M.D., of the Ophthalmology Clinic, completed a medical report dated May 9, 2006, in which the systemic condition was noted as diabetes mellitus. (R. at 183.) The collective impression indicated diabetes mellitus with proliferative diabetic retinopathy with early cataracts. (R. at 183.) Dr. Awan's recommendation noted strict blood sugar control and advised Tyner to see a retinal specialist for evaluation and possible treatment. (R. at 183.)

Gary C. Hubbard, O.D., completed a medical report on May 23, 2006, and determined that Tyner's vision was 20/20 in the right eye and 20/20 in the left eye with the new prescription. (R. at 184.) An external examination was found to be within normal limits, and an internal examination found numerous dot and blot hemorrhages, which was consistent with background diabetic retinopathy. (R. at 184.)

Tyner was treated at Stone Mountain Health Services from October 29, 2004, to May 24, 2006. (R. at 185-212.) During this period of treatment, Tyner reported lower back pain, knee pain, numbness in his feet, right shoulder pain, chronic anxiety, claustrophobia, panic attacks, nervousness around crowds and people, jittery feelings, anxiousness, diffuse muscle aches, insomnia, eye problems, polyuria, polydipsia, occasional dizzy spells, shortness of breath on exertion, retinopathy, development of cataracts, depression, feelings of worthlessness, erectile dysfunction, swelling in extremities, diarrhea and redness and swelling of his right toe. (R. at 185-212.) The diagnoses and clinical assessments included diabetes mellitus type II, hypertension, insomnia, infected ingrown toenail, diabetic peripheral neuropathy, diabetic retinopathy, arthralgias of multiple joints, history of anxiety and mild depression, obesity, caffeine excess, tobacco abuse, impotence, leg edema, increased urinary

frequency, weight gain, arthritis, anxiety with mild depression, chronic back pain, right shoulder pain with limited range of motion, chronic left knee pain, headaches, history of palpitations, foot numbness, chronic anxiety with possible panic attacks and hemorrhages behind the eyes. (R. at 185-212.) On May 24, 2006, Tyner was encouraged to follow up with Dr. Fred Merkel, D.O., regarding medications for treatment of anxiety and depression, and he was advised to return to counseling for his depression. (R. at 185.)

Joe Owens, D.P.M., completed a medical report dated June 29, 2006, in which he noted that Tyner reported numbness in his feet and a non-healing sore. (R. at 215.) A large superficial lesion dorsum of the right foot was observed, and Tyner exhibited a moderate to severe loss of sensation in the feet. (R. at 215.) Owens diagnosed Tyner with diabetes with peripheral neuropathy and a fungal infection. (R. at 215.) Owens indicated that Tyner's feet were at risk due to significant neuropathy, noting that the care of his feet seemed to be hampered by his financial situation. (R. at 215.) Tyner was prescribed medication to treat the fungal infection, and he was advised to return to Owens if the treatment plan failed. (R. at 215.)

Tyner presented to Lanthorn for another psychological evaluation, which was completed on November 7, 2006, at the request of Tyner's counsel. (R. at 224-35.) Tyner reported a variety of physical difficulties, including diabetes which had caused neuropathy and retinopathy that had led to legal blindness in his left eye, back pain, left knee pain, right shoulder pain and hypertension. (R. at 224-25.) The WAIS-III revealed a verbal IQ of 70, a performance IQ of 73 and a full scale IQ of 69, which placed him in the extremely low range of intellectual functioning. (R. at 225, 229.)

Tyner's verbal comprehension index was 72 and his perceptual organization index was 76. (R. at 225.) The test also indicated that Tyner was in the low average range in abstract and logical thinking abilities, as well as in pattern completion and spatial reasoning. (R. at 229.) He tested in the borderline range in the majority of areas, but tested in the extremely low range in his range of vocabulary, fund of general information gained from education and experience and in practical judgment and common sense reasoning. (R. at 230.) The Wide Range Achievement Test - Revision 3, ("WRAT-3"), showed that Tyner tested at a first grade level in reading and spelling, and he tested at a second grade level in arithmetic. (R. at 225, 230.) Lanthorn noted that Tyner was essentially able to read only three and four letter words and appeared to have virtually no skills at phonics. (R. at 230.) All of the areas tested on the WRAT-3 were statistically below his scores on the WAIS-III, suggesting the possibility of learning disorders in each area. (R. at 230.)

Lanthorn diagnosed Tyner with a mood disorder with major depressive-like episodes, moderate to severe, due to chronic medical problems, anxiety disorder with generalized anxiety due to chronic physical problems, pain disorder associated with both psychological factors and chronic general medical conditions, mild mental retardation, economic, educational and occupational problems and problems with access to health care services. (R. at 231.) Lanthorn also reported a then-current GAF score of 45-50. (R. at 231.) It was determined that Tyner was able to manage his own funds, and his prognosis was considered to be guarded at best. (R. at 231.) Lanthorn explained that, from a psychological point of view, Tyner was experiencing significant clinical depression, anxiety, secondary insomnia and an alleged high degree of chronic pain. (R. at 231.) Lanthorn further explained that the conditions had caused Tyner

problems with short-term memory loss, difficulties with concentration, anhedonia, dysphoria, apprehension about his physical health, inner emotional turmoil and an inclination to be somewhat socially withdrawn.  (R. at 231.)  It also was noted that Tyner had a very low degree of energy and appeared to be fairly limited in his daily activities.  (R. at 231.)  Lanthorn found Tyner's communication skills to be intact and explained that his speech was clear and intelligible and he had no difficulties hearing.  (R. at 231-32.)  Lanthorn noted that Tyner suffered from a severe visual impairment and was legally blind in his left eye.  (R. at 232.)  Lanthorn opined that, from a psychological standpoint, it seemed unlikely that Tyner could sustain a 40-hour workweek, even if the job required only simple and repetitive tasks.  (R. at 232.) Lanthorn indicated that Tyner was having problems with irritability, anger and a low frustration tolerance, which placed strains on his interpersonal relationships.  (R. at 232.)  He further opined that Tyner would have a difficult time adapting to and working with coworkers and supervisors.  (R. at 232.)  Lanthorn explained that Tyner should reconsider ongoing psychotherapy, stating the treatment would likely be beneficial to him.  (R. at 232.)  Lastly, Lanthorn pointed out that Tyner should probably be seen by a psychiatrist on a collateral basis to ascertain the efficacy of his current regimen of psychotropic medications.  (R. at 232.)

Lathorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), on November 7, 2006.  (R. at 233-35.)  Lanthorn found that Tyner had a good ability to relate to coworkers and to understand, remember and carry out simple job instructions.  (R. at 233-34.)  Tyner was found to have a fair, or seriously limited, ability to follow work rules, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, function independently,

maintain attention and concentration, understand, remember and carry out detailed, but not complex, job instructions, maintain personal appearance and behave in an emotionally stable manner. (R. at 233-34.) Lanthorn determined that Tyner had a poor, or no useful ability, to understand, remember and carry out complex job instructions, relate predictably in social situations and to demonstrate reliability. (R. at 234.) Lanthorn opined that Tyner was capable of managing his benefits in his own best interest. (R. at 235.)

The record shows that Tyner was treated at Southeastern Retina Associates from March 4, 2005, to April 19, 2007. (R. at 213-14, 236-42.) During this time period, Tyner was diagnosed with cataracts, clinically significant macular edema and non-proliferative diabetic retinopathy. (R. at 213-14, 236-42.)

Tyner was treated by Dr. Fred Merkel, D.O., at the Holtson Medical Group from July 24, 2006, to June 8, 2008, (R. at 243-60, 270-73), and at Family Practice Duffield from March 28, 2006, to July 24, 2006. (R. at 216-20.) During this time period, Tyner complained of problems such as depression, diarrhea, testicular pain, a foot rash, high glucose levels, occasional chest pain and bloating. (R. at 216-20, 243-60, 270-73.) Dr. Merkel's medical assessments and diagnoses indicated hypertension that was under either fair or good control, low back pain with mild disc disease, diabetes mellitus that was under either fair or poor control, neuropathy, retinopathy, an ingrown toenail, diabetes with apparent gastropathy, diarrhea, depression with bipolar features, an apparent tinea corpus on the foot and chronic major depression. (R. at 216-20, 243-60, 270-73.) However, it was noted that Tyner's depression improved and was under control during the course of treatment,

as he acknowledged that Lexapro improved his condition. (R. at 243-60, 270-73.)

On January 10, 2008, five months after the ALJ's decision, Lanthorn performed another psychological report. (R. at 274-79.) Lanthorn once again examined and observed Tyner, diagnosing him with a pain disorder associated with both psychological factors and a chronic general medical condition, anxiety disorder with generalized anxiety due to chronic physical problems, mood disorder with major depressive-like episodes, moderate to severe due to chronic physical problems, ruled out a learning disorder, borderline intellectual functioning, problems with access to healthcare services, economic and educational problems and a then-current GAF score of 45-50. (R. at 278.) Lanthorn noted that, from a psychological standpoint, Tyner's prognosis was guarded. (R. at 278.) He further determined that Tyner was capable of managing his own funds. (R. at 278.) Lanthorn explained that Tyner appeared to be adaptively functioning in the borderline range intellectually, but had significant cognitive limitations in various areas. (R. at 278.) In fact, Lanthorn opined that Tyner was essentially illiterate. (R. at 278.) Lanthorn explained that Tyner had problems with concentration, short-term memory loss, dysphoria, chronic pain, anhedonia and difficulties initiating and completing tasks. (R. at 278.) Tyner's daily activities were found to be very limited, as it was noted that he relied heavily upon his wife for all household chores. (R. at 278-79.)

Lanthorn also referenced Tyner's lost eyesight in his left eye and blurred vision, which was likely due to diabetes mellitus. (R. at 279.) Lanthorn opined that Tyner was unable to sustain a 40-hour workweek, even if he were to be limited to simple and repetitive tasks. (R. at 279.) Furthermore, he found that Tyner would likely have a

difficult time dealing cognitively with the demands of work and would have a difficult time working effectively on a daily basis with coworkers, the general public and supervisors. (R. at 279.) Lanthorn encouraged Tyner to seek treatment from his local mental health center or provider, noting that he should see both a therapist and a psychiatrist. (R. at 279.) Lastly, Lanthorn explained that Tyner's then-current psychotropic medications were ineffective in treating his problems. (R. at 279.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 31, 2007, the ALJ denied Tyner's claims. (R. at 16-22.) The ALJ found that Tyner met the insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 21.) The ALJ also found that Tyner had not engaged in substantial gainful activity since July 15, 2005, the alleged onset date of disability. (R. at 21.) The ALJ determined that the medical evidence established that Tyner suffered from severe impairments, namely diabetes mellitus with diabetic neuropathy and peripheral neuropathy, obesity, borderline intellectual functioning and anxiety disorder. (R. at 21.) However, he found that Tyner did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ noted that Tyner's allegations regarding his limitations were not totally credible. (R. at 21.) The ALJ determined that Tyner retained the residual functional capacity to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and sit, stand or walk for a total of six hours in a typical eight-hour workday. (R. at 21.) The ALJ also found that Tyner could not perform jobs that would require more than occasional pushing or pulling with the lower extremities, or that would involve more than occasional climbing, balancing, kneeling, crouching, crawling, bending or stooping, and that he would be precluded from climbing ladders, ropes or scaffolds, as well as working in environments with concentrated exposure to hazards. (R. at 21.) The ALJ further found that Tyner could

not perform jobs that required excellent vision and good depth perception, and he also could not perform jobs unless they were simple, easy to learn and required no more than minimal reading. (R. at 21.)    Based upon these findings, the ALJ found that Tyner was unable to perform his past relevant work. (R. at 22.)  In addition, it was noted that Tyner had not acquired any skills from his past relevant work that would be transferable to other jobs within his residual functional capacity. (R. at 22.) The ALJ found that, although Tyner's limitations did not allow him to perform the full range of light work, there were a significant numbers of jobs in the national economy that Tyner could perform, such as a cleaner, a general production worker and a packer. (R. at 22.)  Thus, the ALJ concluded that Tyner was not under a disability as defined in the Act and was not entitled to benefits.  (R. at 30-31.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

Tyner argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-9.)  Tyner also contends that the ALJ erred by failing to give full consideration to Lanthorn's findings as to the severity of Tyner's mental impairments and how the impairments impacted his ability to work. (Plaintiff's Brief at 9-10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456.  In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Tyner's argument that the ALJ erred with respect to the residual functional capacity determination. (Plaintiff's Brief at 6-9.) Tyner essentially argues that the ALJ's residual functional capacity determination is unsupported by substantial evidence of record. (Plaintiff's Brief at 6-9.) In asserting this argument, Tyner primarily cites the findings of Lanthorn, as well as the treatment notes and diagnoses made by Dr. Merkel. (Plaintiff's Brief at 7-9.) Tyner contends that the ALJ's residual functional capacity finding was unsupported and in direct contradiction to the evidence of record, noting that although the ALJ found that Tyner suffered from a severe anxiety disorder, he failed to include any resulting limitations in his residual functional capacity finding. (Plaintiff's Brief at 9.) Tyner also points

out that Lanthorn's finding that he was "essentially illiterate," in combination with his other physical impairments, demonstrates that he cannot perform substantial gainful activity. (Plaintiff's Brief at 9.) After a review of the record, the undersigned finds this argument to be unpersuasive.

The ALJ determined that Tyner retained the residual functional capacity to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and sit, stand or walk for a total of six hours in a typical eight-hour workday. (R. at 21.) In addition, the ALJ found that Tyner could not perform jobs that would require more than occasional pushing or pulling with the lower extremities, or that would involve more than occasional climbing, balancing, kneeling, crouching, crawling, bending or stooping, and that he would be precluded from climbing ladders, ropes or scaffolds, as well as working in environments with concentrated exposure to hazards. (R. at 21.) The ALJ also indicated that Tyner could not perform jobs that required excellent vision and good depth perception, and, due to his mental limitations, it was determined that he could not perform jobs unless they were simple, easy to learn and required no more than minimal reading. (R. at 21.) I am of the opinion that this assessment is supported by substantial evidence of record, particularly the opinions expressed by the state agency sources.

On December 12, 2005, Dr. Williams, a state agency physician, completed a PRFC. (R. at 176-82.) Dr. Williams found that Tyner could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in a typical eight-hour workday and that Tyner had an unlimited ability to push and/or pull. (R. at 177.) Dr.

Williams also found that Tyner was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 178.) No manipulative, visual or communicative limitations were noted. (R. at 178-79.) As for environmental limitations, Dr. Williams determined that Tyner should avoid concentrated exposure to hazards such as machinery and heights. (R. at 179.) Dr. Williams indicated that the treating or examining source statements regarding Tyner's physical capacities were not in the file that he reviewed. (R. at 180.) Dr. Williams noted that Tyner's allegations were found to be partially credible. (R. at 182.) These findings were reviewed and affirmed by Dr. Johnson, another state agency physician, on May 1, 2006. (R. at 180.)

Leizer, a state agency psychologist, completed an MRFC on January 12, 2006, in which he found that Tyner was not significantly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand, remember and carry out very short and simple instructions; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 172-75.) Leizer found Tyner to be moderately limited in the following areas: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (R. at 172-73.) These findings were reviewed and affirmed by state agency psychologist Hamilton on May 1, 2006. (R. at 174.)

Leizer then completed a PRTF on January 17, 2006, in which he noted that a residual functional capacity assessment was necessary, and he indicated that Tyner had symptoms of mental retardation and anxiety-related disorders. (R. at 158-71.) However, Leizer determined the medically determinable impairments of borderline intellectual functioning an anxiety disorder did not precisely satisfy the required diagnostic criteria. (R. at 162-63.) Leizer found that Tyner would be mildly limited in his activities of daily living and in his ability to maintain social functioning, and he noted that Tyner was moderately limited in his ability to maintain concentration, persistence or pace. (R. at 168.) There was no evidence of episodes of decompensation. (R. at 168.) Leizer found Tyner's allegations to be partially credible, and he concluded that Tyner appeared to be capable of competitive, unskilled substantial gainful activity. (R. at 171.) Leizer's findings were reviewed and affirmed state agency psychologist Hamilton on May 1, 2006. (R. at 158.)

As previously noted, the court's function in disability cases is to determine if substantial evidence exists in the record to support the ALJ's findings. In determining

whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In this case, the ALJ clearly considered all of the relevant evidence; however, in considering that evidence, the ALJ gave little weight to the psychological findings of Lanthorn. (R. at 19.) The ALJ found that Lanthorn's medical assessment was inconsistent with his own medical findings, pointing out that Tyner failed to seek mental health treatment and the fact that the record showed that a treating physician indicated that Tyner's depression was well-controlled. (R. at 19.)

In examining the evidence of record, I find that the ALJ was justified in according little weight to the opinions of Lanthorn, as the findings were inconsistent with the findings of the state agency sources and because Dr. Merkel's treatment notes indicate that Tyner's depression, and other psychological allegations, had improved and were well-controlled. The Fourth Circuit has plainly stated that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, I disagree with Tyner's assertion that the ALJ failed to include limitations relating to his determination that Tyner suffered from severe anxiety disorder. In rendering his residual functional capacity determination, the ALJ specifically stated that, due to Tyner's mental impairments, he was further restricted to simple jobs that would be easy to learn and would not require more than minimal reading. (R. at 20.) As such, the court finds that the ALJ clearly accounted for Tyner's mental impairments.

Thus, based on the opinions of the state agency sources, particularly with respect to Tyner's mental capabilities, as well as the fact that Dr. Merkel's treatment notes indicate that Tyner's psychological problems had improved and were under control, I am of the opinion that the ALJ's residual functional capacity finding is supported by substantial evidence of record.

Next, Tyner argues that the ALJ failed to give full consideration to the findings of Lanthorn as to the severity of his mental limitations and the resulting impacts on his ability to work. (Plaintiff's Brief at 9-10.) For the reasons discussed above, the court finds that the ALJ was justified in not giving full consideration to the findings of Lanthorn. The court further notes that Tyner appears to contend that the ALJ erred by substituting his opinion for that of a trained medical professional, i.e., that the ALJ erred by not adopting the findings of Lanthorn. (Plaintiff's Brief at 9-10.) The court recognizes the general principle that "[i]n the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). However, in the case at hand, this argument is without merit.

As discussed above, the record contains opinions of state agency psychologists Leizer and Hamilton, who both rendered findings in line with the ALJ's decision, as they both determined that Tyner was capable of substantial gainful activity. Thus, the ALJ's opinion is supported by other psychiatric or psychological of record, demonstrating that he did not substitute his opinion for that of a trained medical

professional.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Tyner's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 3rd day of December 2009.

/s/  Glen M. Williams
SENIOR UNITED STATES DISTRICT JUDGE